J-A07038-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| IBRAHIM  MUHAMMED, | : | |
| | : | |
| Appellant | : | No. 358 EDA 2017 |

Appeal from the Judgment of Sentence December 23, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004101-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| IBRAHIM  MUHAMMED, | : | |
| | : | |
| Appellant | : | No. 359 EDA 2017 |

Appeal from the Judgment of Sentence December 23, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004103-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| IBRAHIM  MUHAMMED, | : | |
| | : | |
| Appellant | : | No. 361 EDA 2017 |

Appeal from the Judgment of Sentence December 23, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004105-2012

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

---

*   Former Justice specially assigned to the Superior Court.

J-A07038-19

**FILED JUNE 11, 2019**

Appellant, Ibrahim Muhammed, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of three counts of first-degree Murder and related offenses described *infra*. Appellant asserts eight claims of trial court error, none of which has merit. We affirm.

The trial court aptly sets forth the pertinent facts and procedural history of the case *sub judice*, as follows:

> On December 21, 2016, following a capital murder jury trial before [the trial court], defendant Ibrahim Muhammed [hereinafter "Appellant"] was convicted of three counts of first-degree murder (18 Pa.C.S. § 2502), three counts of robbery (18 Pa.C.S. § 3701), one count of criminal conspiracy (18 Pa.C.S. § 903), one count of carrying a firearm without a license (18 Pa.C.S. § 6106), one count of carrying a firearm on the streets of Philadelphia (18 Pa.C.S. § 6108), and one count of possessing an instrument of crime (18 Pa.C.S. § 907). Appellant was tried with his co-defendant Nalik Shariff Scott. As the jury was unable to reach a consensus following a penalty phase hearing, the [trial court] imposed an aggregate sentence of three consecutive life sentences to be followed by fifty to one hundred years' incarceration (18 Pa.C.S. § 1102(a)(1)). Appellant did not file post-sentence motions.

> FACTUAL BACKGROUND

> At trial, the Commonwealth presented the testimony of [numerous Philadelphia Police detectives and officers, a Philadelphia Firefighter lieutenant, medical experts, and other witnesses], and several eyewitnesses. Appellant presented testimony from [Philadelphia Police detectives and officers, several physicians, and numerous eyewitnesses. Co-defendant Scott presented the testimony of detectives and officers, a Philadelphia Firefighter lieutenant, and a Delaware State Chief Medical Examiner, and several eyewitnesses]. Viewed in the light most favorable to the

- 2 -

Commonwealth as the verdict winner, the evidence established the following.

On September 6, 2011, Porfirio Nunez, his wife Juana Nunez, and his sister Lina Sanchez, were working at their family owned Lorena's Grocery, which was located at the corner of 50th and Parrish Streets in Philadelphia. N.T. 12/7/16, at 223-224, 227. Also working that day were Porfirio and Juana's daughters, Jessica and Laura Nunez. N.T. at 12/7/16 at 227.[] At approximately 7:55 p.m., Porfirio was located by the back refrigerators, while Lina and Juana were in the back food preparation area and Jessica and Laura were at the front registers. N.T. 12/7/16 at 228; 12/8/16 at 216; 12/9/16 at 228. At that time, Appellant Muhammed and co-defendant Scott entered the store. N.T. 12/7/16 at 228.

Upon entering, Scott went behind the counter where Laura and Jessica were located and grabbed Laura by her hair, while Appellant went to the back of the store where Lina and Juana were located. N.T. 12/7/16 at 228-229, 237; 12/8/16 at 216-217, 219-220. After Scott grabbed Laura's hair, he pushed her to the ground, causing Laura and Jessica to scream. N.T. 12/7/16, at 228, 230; 12/8/16 at 216. Hearing his daughters' screams, Porfirio came out to the aisle to see what was going on at the front of the store. N.T. 12/7/16 at 228. Co-defendant Scott, who was in possession of a 9-millimeter handgun, pointed the firearm at Porfirio and shot him through the arm and into his chest. N.T. 12/7/16 at 228, 230-232; 12/8/16, at 193-194; 12/12/16, at 323, 328-329. Porfirio then ran into the back of the store. N.T. at 12/7/16, at 228, 232. Hearing the gunshot, Appellant then took out his own gun and began shooting Juana and Lina. N.T. 12/7/16, at 233. Appellant shot Lina Sanchez in her abdomen and back before shooting Juana in the chest and top of her head. N.T. 12/7/16, at 233-236; 12/8/16, at 198-204. Appellant then turned towards Porfirio and shot him three times in the chest and back. N.T. 12/7/16, at 233-236; 12/8/16, at 190.

After shooting Porfirio, Juana, and Lina, Appellant walked towards Jessica while co-defendant Scott, still holding Laura to the floor, yelled at Jessica to "give [him] the money." N.T. 12/7/16, at 234-236; 12/8/16, at 217. Believing that she was about to be shot, Jessica opened the cash register. N.T. 12/7/16, at 236. Appellant and Scott then grabbed what they could from the register before

leaving through the front door and fleeing the area. N.T. 12/7/16, at 131-133, 238-239; 12/8/16, at 217.

Police responded to the store to find Porfirio, Juana, and Lina [lying] on the floor inside the store. N.T. 12/6/16, at 270-272. Lina, who was still showing signs of life, was rushed to the Hospital at the University of Pennsylvania. N.T. 12/6/16, at 273-276, 298; 12/8/16, at 201. Juana and Porfirio were similarly transported to the hospital, though they did not show signs of life at the time. N.T. 12/6/16, at 281. Police recovered three projectiles and nine 9mm fired cartridge cases from the scene. N.T. 12/6/16, at 203-204, 208-09; 12/12/16, at 32-333. The medical examiner recovered five bullets from the bodies of the victims. N.T. 12/12/16, at 323.

Porfirio was shot a total of five times: twice in his chest, perforating his spleen, diaphragm, vertebrae, and spinal cord; once in his arm and chest, penetrating his left lung, heart, esophagus, and liver; once in his back, penetrating his lungs and vertebrae; and once in his hand. N.T. 12/8/16 at 190, 193-194. Lina Sanchez was shot a total of two times: once in the upper back, penetrating her back, neck, and mouth; and once in the abdomen, penetrating her colon, liver, and right kidney. N.T. 12/8/16, at 198-199. Juana was shot a total of three times: once in the base of her neck; once in her chest, penetrating her left lung, left pleura, and vertebrae; and once in the head, penetrating her brain and vertebrae. N.T. 12/8/16, at 202-204.

In early February, 2012, narcotics police officers observed Appellant selling marijuana near the corner of Reedland Street and 62nd Street in Philadelphia, and subsequently arrested him. N.T. 12/9/16, at 106-111. Following his arrest, Appellant informed police that he had information about robberies and shootings. N.T. 12/9/16 at 114, 116.

Appellant was brought to the Southwest detectives' headquarters and talked with Detective Joseph Murray, who began to believe that Appellant may have been involved in the Parrish Street murders at Lorena's Grocery. N.T. 12/9/16, at 149-150, 154. Appellant was then brought to the Homicide Unit, where he was interviewed by Detective Thomas Gaul. N.T. 11/9/16, at 251-252.

Appellant was given *Miranda* warnings and ultimately provided a statement inculpating himself in the murders. N.T. 12/9/16, at

- 4 -

254-259, 270; 12/12/16 at 89-99. Appellant admitted to police that he and "Leek" went into the store to rob it, that he was in the back of the store with the women, that he heard a gunshot, and then pulled out his own gun and began firing. N.T. 12/12/16, at94-95. Appellant stated that he was firing indiscriminately and that he may have shot a man accidentally as he was leaving the store. N.T. 12/12/16, at 94-95. Appellant identified Scott as his co-conspirator in the robbery/homicides. N.T. 12/12/16, at 96.

On February 10, 2012, police detectives prepared a photo spread containing Appellant's photograph and brought it to Jessica and Laura, who both independently identified Appellant. N.T. 12/7/16, at 272-273; 12/8/16, at 237-238; 12/13/16, at 94-96, 112-113. Later that day, Jessica was brought to police headquarters where she identified Appellant in a photo spread. N.T. 12/7/16, at 275-276; 12/13/16, at 97.

Trial Court Opinion, 6/14/17, at 1-6.

Appellant presents the following questions for our consideration:

1. Whether the trial court erred in not permitting the defense to ask follow-up questions to jurors who answered affirmatively to either: [a.] if Appellant was found guilty of first degree murder, they could not give a death sentence even if the prosecution proved beyond a reasonable doubt that a death sentence was warranted; or, [b.] they could not give a life sentence if Appellant was found guilty of first degree murder, and the penalty phase evidence showed a life sentence was warranted.

2. Whether the trial court erred in denying the defense's ***Batson*** motion.

3. Whether the trial court erred in denying the defense's motions to suppress physical evidence, Appellant's statements and any in-court and out-of court identifications.

4. Whether the Commonwealth committed prosecutorial misconduct during closing arguments.

5. Whether the trial court erred in not granting the defense motion for mistrial.

6. Whether the trial court erred in allowing the Commonwealth to introduce evidence and argue in closing arguments that defense counsel was deficient for not providing timely notice of alibi defense.

7. Whether the trial court erred in not allowing Appellant to present his gait to the jury.

8. Whether the trial court erred in allowing the Commonwealth to show a video displaying the defense medical expert's participation in the Colorado theatre murder case.

Appellant's brief, at 6.

Appellant's first issue involves the court's questioning of venirepersons during *voir dire*. In assessing Appellant's claim, we are guided by the following standard of review.

> The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of *voir dire* is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. The scope of *voir dire* should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court.

**Commonwealth v. Karenbauer**, 715 A.2d 1086, 1094 (Pa.1998) (internal citations and quotation marks omitted).

Appellant complains that the trial court erred when it declined his request that follow-up questions be put to each individual venireperson who

answered affirmatively to the court's group question asking if any person possessed "religious, conscientious, or moral scruples that would either prevent you or substantially impair you from returning a sentence of death. . . ." N.T. at 11/28/17, at 123. Appellant argues that instead of immediately dismissing those venirepersons who indicated they would be so prevented or substantially impaired, the court should have first permitted him to examine fully each juror's reason for providing such an answer.

> "The decision whether to disqualify a juror for the inability to impose a death sentence in a proper case lies in the discretion of the trial court which will not be reversed except for abuse of that discretion." *Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 300 (1996) (citation omitted). Voicing a general objection to the death penalty or expressing conscientious or religious scruples is insufficient reason for disqualification. *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 81 (2004) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). "Rather, exclusion for cause is warranted only if the venireperson's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation omitted)).

*Commonwealth v. Keaton*, 45 A.3d 1050, 1069 (Pa. 2012).

*Keaton* involved the same *voir dire* question presently at issue in the case *sub judice*. In concluding that follow-up questioning was unnecessary where a venireperson confirms that his or her beliefs will *prevent* them from imposing the death penalty, the Supreme Court explained:

> The question posed to the venirepersons asked if their beliefs would *prevent* them from imposing the death penalty, even when it was called for. In the face of an affirmative answer, further query regarding whether they could set aside their beliefs would

have been illogical—the word "prevent" implies they could not. In *Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441 (1997), and *Commonwealth v. Cox*, 556 Pa. 368, 728 A.2d 923 (1999), we addressed *voir dire* procedures nearly identical to the present one, and observed: "As a trial judge has wide latitude in supervising the manner in which *voir dire* is conducted, including the power to prevent further *voir dire* when response to death qualification questions prove that additional inquiry will be fruitless, the trial court [does] not err by dismissing the jurors." *Harris*, at 446 (citation omitted). We further stated, "We reject appellant's argument that trial counsel should have continued to question the excused jurors.... The trial court correctly removed jurors when it found that their views on capital punishment would 'prevent or substantially impair' the performance of their duties...." *Cox*, at 930–31. Thus, we perceive no impropriety in the dismissal of these 15 venirepersons;

*Keaton*, 45 A.3d at 1069–70.

The present case falls squarely under *Keaton*, as it would have been pointless for the court here to continue *voir dire* of venirepersons, who already indicated their beliefs prevented them from imposing the death penalty, by asking if they could set aside such core beliefs and sit in this capital case. Therefore, we discern no error with the court's dismissal of these venirepersons. [1]

Appellant's second issue also pertains to *voir dire*, as Appellant contends the court erred in denying his ***Batson***[2] motion made in response to the

---

[1] Appellant acknowledges that *Keaton* is binding, but he baldly asserts that we should reexamine the decision given the uncertain scope of the word "prevent." Even if Appellant provided an ostensibly compelling argument in this regard—he does not—*Keaton* represents controlling precedent of the Pennsylvania Supreme Court that we are bound to apply to the present matter.

[2] ***Batson v. Kentucky***, 476 U.S. 79 (1986).

Commonwealth's decision to use four of its five peremptory challenges to strike African Americans. We disagree.

> A **Batson** claim presents mixed questions of law and fact. Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous.
>
> In **Batson**, the [Supreme Court of the United States] held that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution. When a defendant makes a **Batson** challenge during jury selection:
>
>> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

**Commonwealth v. Edwards**, 177 A.3d 963, 971 (Pa. Super. 2018) (citations and quotation marks omitted). "The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination." **Commonwealth v. Towles**, 106 A.3d 591, 602 (Pa. 2014) (citation omitted). This Court must give great deference to a trial court's determination that peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. **See id.**

The particular venireperson pool in question began with 37 Caucasian, 37 African American, 9 Hispanic, four Asian, two who provided no race information, and one who identified as "other." After group *voir dire*, when the court dismissed venirepersons either by agreement of the parties or due to their answers to the death penalty question described above, the pool comprised nine Caucasians, nine African-Americans, and four Hispanics.

According to Appellant, the Commonwealth's reasons for using four of its five available peremptory strikes on African Americans were pretextual and hardly race-neutral. Appellant's brief, at 14. The sum of his argument in this vein states, "There is no other fair conclusion than to state that the defense established a *prima facie* case of racial discrimination by virtue of the astounding percentage of prosecution strikes of African Americans." Appellant's brief, at 14.

The trial court responds, first, that of the six venirepersons from this group who were ultimately chosen for the jury, four were African-American. Therefore, although representing only 41% of the available jurors following group *voir dire*, African Americans constituted 67% of the chosen group.

Also, the court found the Commonwealth's explanations for each of its five peremptory challenges to be both credible and race-neutral. The respective explanations were: attenuated residency in Philadelphia; prison employment duties included assessing inmates' medical needs and health issues; unusual staring at the prosecutor even when other persons were asking him questions; and young age and immature manner.

In the totality of these circumstances, we find no error where the Commonwealth provided the court with plausible, race-neutral explanations for each peremptory challenge and the trial court found Appellant failed to carry his burden of proving purposeful discrimination with his claim of pretext. *See Towles*, *supra* at 602; *Edwards*, *supra* at 971. Appellant's *Batson* issue, therefore, merits no relief.

In Appellant's next issue, he challenges the denial of his motion to suppress. Specifically, Appellant maintains there was no probable cause to support a search warrant of a residence from which Appellant conducted two separate money-for-marijuana exchanges with a confidential informant.

The entirety of his argument in this regard states:

> In the present case, the warrant did not express the reliability of the confidential information. Police had not received tips or information that Appellant or the residence were involved in narcotics trafficking. The buy was not prearranged, and the alleged seller did not enter the house after the transactions to support an inference he lived there. In short, the facts here do not support a fair and common sense, non-technical support [sic] probable cause exists for a search of the residence.

Appellant's brief, at 19. Because Appellant's arrest, confession, and all physical evidence flowed from the execution of this unlawful search warrant, Appellant argues, the court erred in denying his motions to suppress. We disagree.

This Court has stated generally, "The ultimate issue in a suppression hearing is whether the police officer affiants had probable cause at the time

they applied for a search warrant." ***Commonwealth v. Luton***, 672 A.2d 819

(Pa.Super. 1996). In this regard,

> the Commonwealth has the burden of proving that the facts presented to the magistrate demonstrate probable cause. The standard for evaluating whether probable cause exists for the issuance of a search warrant is the "totality of the circumstances" test as set forth in ***Illinois v. Gates***, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), which was adopted by the Pennsylvania Supreme Court in ***Commonwealth v. Gray***, 509 Pa. 476, 484, 503 A.2d 921, 925 (1985). A magistrate is to make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." The information offered to establish probable cause must be viewed in a common sense, non-technical manner and deference must be given to the issuing magistrate. It must be remembered that probable cause is based on a finding of the probability of criminal activity, not a *prima facie* showing of criminal activity.

***Luton***, 672 A.2d at 821–22 (some citations omitted).

Here, our review of the record supports the following observation of the

trial court:

> [T]he affidavit of Officer Cuffie in support of the search warrant set forth all of the above-described facts regarding Cuffie's narcotics surveillance of [Appellant] in February 2011. As stated above, she observed two transactions during which [Appellant] took money from the informant, went into the property at 6215 Reedland Street, and then came out and gave small objects to the informant that turned out to be baggies of marijuana. Commonwealth Exh. CM-5 (search warrant affidavit). That was sufficient to establish a fair probability that evidence of a crime would be found at 6215 Reedland Street.

Trial Court Opinion, at 9.

Under the totality of the circumstances thus described, the affidavit presented by Officer Cuffie established probable cause that justified the issuance of a search warrant of 6215 Reedland Street. As Appellant premises his entire suppression challenge on a meritless argument aimed at the sufficiency of the probable cause affidavit, we discern no merit to this challenge.

Appellant's next two issues implicate the Commonwealth's closing arguments. Specifically, in Appellant's brief, he argues that prosecutorial misconduct occurred during closing arguments where the prosecutor alluded to a medical expert's compensation as a source of potential bias, referenced his own comparatively modest compensation despite the lack of an evidentiary basis for so doing, speculated that the defense investigator may have been schizophrenic or bipolar, and speculated that an uncalled defense witness would have denied the defense theory that an acquaintance—and not Appellant—was depicted in an incriminating video. In light of such misconduct, Appellant posits, the court should have granted the defense motion for mistrial.

Initially, we note that in reviewing a claim of improper prosecutorial comments, our standard of review "is whether the trial court abused its discretion." *Commonwealth v. Hall*, 701 A.2d 190, 198 (Pa. 1997). Additionally,

> with specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather

- 13 -

must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa.Super. 2016) (quotation marks, quotation, and citations omitted).

The trial court responds that Appellant has waived much of his issue by framing it in a vague Pa.R.A.P. 1925(b) statement. Specifically, Appellant's Rule 1925(b) statement provided:

The Honorable Trial Court erred by permitting the prosecutor to make arguments about evidence that was not in the record, make outrageous arguments which were designed to prejudice the jury against defense counsel and the defendants, and misrepresent the contents of the record. *See generally* N.T. 12/21/2016. Moreover, the Honorable Trial Court erred by permitting the prosecutor to commit misconduct by consistently making impermissible appeals to emotion and racial bias throughout the trial. *See*, *inter alia*, N.T. 12/21/2016, 33-34.

Appellant's Pa.R.A.P. 1925(b) Statement, dated 4/20/17. The trial court opines Appellant preserved only the allegedly improper arguments appearing

- 14 -

on pages 33 to 34 of the Notes of Testimony of closing arguments, as a court is not required to "comb through" the notes of testimony in an effort to guess to what Appellant refers in this broadly stated Rule 1925(b) statement.

We observe that, generally,

> issues not raised in a Rule 1925(b) statement will be deemed waived for review. An appellant's concise statement must properly specify the error to be addressed on appeal. In other words, the Rule 1925(b) statement must be "specific enough for the trial court to identify and address the issue [an appellant] wishe[s] to raise on appeal." **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super. 2006), **appeal denied**, 591 Pa. 712, 919 A.2d 956 (2007). "[A] [c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." **Id**. The court's review and legal analysis can be fatally impaired when the court has to guess at the issues raised. Thus, if a concise statement is too vague, the court may find waiver.

**Commonwealth v. Hansley,** 24 A.3d 410, 415 (Pa.Super. 2011) (some internal citations omitted).

Here, we agree with the trial court's conclusion that the vagueness of Appellant's Pa.R.A.P. 1925(b) statement on this issue left it in a position to guess what specific issues were being raised, thus impairing its ability to identify most instances of prosecutorial misconduct alleged. We, therefore, discern no error in the court's determination that Appellant's Rule 1925(b) statement preserved only that prosecutorial misconduct claim centered on the

prosecutor's comments appearing on pages 33 to 34 of the December 21, 2016 Notes of Testimony. *See* Trial Court Opinion, at 18-19.[3]

A review of the argument section of Appellant's brief, however, shows that Appellant presents no argument to advance this particular issue. *See* Appellant's brief, at 16-17. Accordingly, he has waived this issue for briefing deficiencies.

In Appellant's next issue, he charges error with the trial court's ruling permitting the Commonwealth to introduce evidence and argue in closing that the defense was deficient for failing to provide timely notice of an alibi defense. Again, however, we are unable to address the merits of this issue.

The argument section of Appellant's brief consists of six lines of text containing neither a specific reference to the record to support the allegation nor a citation to—let alone an analysis of—relevant case law. Consequently, we determine Appellant has waived his claim for failure to develop an argument. *See Commonwealth v. Cannavo*, 199 A.3d 1282, 1289 (Pa.Super. 2018) ("We shall not develop an argument of an appellant, nor shall we scour the record to find evidence to support an argument; instead we will deem [the] issue . . . waived.") (citation omitted); *see also* Pa.R.A.P. 2119(a), (c) (requiring argument section to include, *inter alia*, separate sections developing discrete arguments and citations to record when reference

---

[3] The prosecutor made the remarks in question in response to the opinion of a defense expert, who had testified a victim is more likely to make a mistake in identifying a perpetrator who is of a different race than he or she is. *See* N.T. 12/21/16, 33-34.

is made to "pleadings, evidence, charge, opinion or order, or any other matter appearing in the record[.]").

Appellant's final two issues pertain to the trial court's evidentiary rulings. "The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion." *Commonwealth v. Clemons*, 200 A.3d 441, 474 (Pa. 2019) (citation omitted). Our standard of review of a challenge to an evidentiary ruling is therefore limited. *Commonwealth v. Conte*, 198 A.3d 1169, 1180 (Pa.Super. 2018). "Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

The first evidentiary matter pertains to the trial court's ruling denying Appellant's request to present his gait to the jury to prove it did not match that of the person depicted on the video of the robbery. According to the court, the demonstration was of tenuous relevancy because too much time had passed from the time of the robbery to the time of trial. Appellant now contends the court should have allowed the jury to decide what weight to attach to the proffer.

Appellant claims there are "legions of cases which cover the fact that such a physical characteristic can be displayed to the jury for its fact finding decision on identification." Appellant's brief, at 15. He fails, however, to cite or discuss even one such decision. Therefore, we are constrained again to

find Appellant has failed to present an adequate argument advancing an issue he raises. **See Cannavo**, **supra**.

The same failure to cite to pertinent authority and develop meaningful argument defeats Appellant's second evidentiary challenge. Specifically, Appellant argues that the trial court erred in its response to his objection during the prosecution's cross-examination of his expert medical witness. Specifically, the court had made a pretrial ruling permitting the prosecution on cross-examination to inform the jury that the medical expert had provided mental health testimony in previous criminal trials. The ruling, however, also prevented the Commonwealth from revealing with any specificity the fact that one of the expert's previous cases involved the widely publicized Colorado movie theater shooting case, which was tried in the year before the case *sub judice*.

During cross-examination, however, the prosecutor named the case specifically, purporting it was fair response to the expert's inaccurate claim that she had only testified for other defendants on two prior occasions, when the "Colorado Theater Shooting" case represented the third case in which she so testified.

The trial court sustained Appellant's objection, N.T., 12/19/16, at 62, and during a subsequent break admonished the prosecution for needlessly revealing the subject matter of the Colorado trial. N.T. at 78-81. The court,

then, reviewed the prosecution's intended use of a video[4] from the Colorado trial to supplement cross-examination of the expert, and it determined the video was unnecessary unless the expert directly contradicted parts of her testimony recorded in the video, at which point the court would conduct a side-bar discussion prior to approving use of the video. N.T. at 82-87.

Neither defense counsel moved for mistrial, asked the court to determine if any juror observed the writing on the video still, or objected to the court's handling of the matter in any way. Moreover, the video was not shown to the jury.

Herein, Appellant now advances a single-sentence argument cursorily positing that "this effort by the prosecution was a direct attempt to sabotage the defense's case and should not be tolerated. The violation was of such egregious nature that the case should be dismissed." Appellant's brief, at 15. Appellant cites to no authority to support his position. We, therefore, find the

_____

[4] A still of the video was visible momentarily before the court excused the jury and invited argument on the video's admissibility. During argument, Appellant's counsel noticed the words "Live Theater Shooting Trial" at the lower left-hand of the screen. N.T. at 80-81. The prosecutors claimed they could not see the wording, nor could the court see it, but the court ordered the lights dimmed and asked Appellant's counsel to sit in the jury box and say whether the words were visible from that vantage point. N.T. at 81. Counsel said "Yes, it's not hard. It says 'Colorado' with a big seal, 'Colorado County' behind it in the back of the frame." N.T. at 81-82. As discussed, *infra*, the court excluded the video without prejudice to the prosecution's right to reargue the matter should the expert's pending testimony increase the probative value of the video.

present claim waived for briefing deficiencies. **See Cannavo**, **supra**. In the alternative, we would concur with the trial court's apt observation that it sustained Appellant's objections and did not permit the Commonwealth to use the video. Trial Court Opinion, at 33. Under this record, we perceive no basis for relief.

For the foregoing reasons, we affirm judgment of sentence.

Judge Dubow joins the memorandum.

Judge Olson concurs in the result.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/11/2019

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

IBRAHIM MUHAMMED

CP-51-CR-0004101-2012 Comm. v. Muhammed, Ibrahim
Opinion

7959774961

CP-51-CR-0004101-2012
CP-51-CR-0004103-2012
CP-51-CR-0004105-2012

OPINION

BRONSON, J.                                          June 12, 2017

**FILED**

JUN 1 2 2017

**Office of Judicial Records**
**Appeals/Post Trial**

On December 21, 2016, following a capital murder jury trial before this Court, defendant

Ibrahim Muhammed was convicted of three counts of first degree murder (18 Pa.C.S. § 2502),

three counts of robbery (18 Pa.C.S. § 3701), one count of criminal conspiracy (18 Pa.C.S. § 903),

one count of carrying a firearm without a license (18 Pa.C.S. § 6106), one count carrying a

firearm on the streets of Philadelphia (18 Pa.C.S. § 6108), and one count possessing an

instrument of crime (18 Pa.C.S. § 907). Defendant was tried with his co-defendant Nalik Shariff

Scott. As the jury was unable to reach a consensus following a penalty phase hearing, the Court

imposed an aggregate sentence of three consecutive life sentences to be followed by fifty to one

hundred years incarceration (18 Pa.C.S. § 1102(a)(1)). Defendant did not file post-sentence

motions.

Defendant has now appealed from the judgment of sentence entered by the Court on the

grounds that the Court erred by: 1) denying defendant's motion to suppress defendant's

statement to police and victim identifications; 2) preventing defendant from inquiring about

potential jurors' bias against Muslims; 3) automatically disqualifying potential jurors who

indicated they would have scruples that would prevent them from returning a death sentence or

life sentence without providing counsel the opportunity to question those jurors concerning the nature of those issues; 4) denying defendant's *Batson* motion; 5) permitting the prosecutor to repeatedly refer to defendants as "evil" during opening arguments and permitting the prosecutor to commit misconduct by appealing to emotion and racial bias throughout trial; 6) permitting the prosecutor to impermissibly lead key witnesses during direct examination and denying defendant a full and fair opportunity to cross examine witnesses regarding their perception and memory; 7) denying defendant's motion to preclude the Commonwealth from presenting expert testimony concerning the quality of relevant video; 8) permitting the prosecutor to impermissibly elicit testimony concerning witnesses' fear of testifying, and to argue inflammatory evidence concerning a witness' failure to identify defendant at a line-up due to his fear of defense counsel; 9) permitting the prosecutor to argue that defense counsel were wealthy and that defendants hired expensive attorneys and experts to defend him; 10) permitting the prosecutor to solicit irrelevant and prejudicial testimony concerning a defense medical expert's involvement with other cases; 11) permitting the prosecutor to introduce evidence that defense counsel failed to provide alibi notice in a timely manner, and by permitting the prosecutor to argue the issue in closing arguments; 12) allowing the prosecutor to manufacture rules of evidence and imply untrue facts during the cross examination of a defense private investigator; 13) prohibiting defendant from demonstrating his gait in court; 14) permitting the prosecutor to commit misconduct during closing arguments and consistently make impermissible appeals to emotion and racial bias throughout trial; and 15) denying defendant's motion for mistrial. Statement of Errors Complained of on Appeal ("Statement of Errors") at ¶¶ 1-15.[1] For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

---

[1] Defendant's Statement of Errors contains several citations to the record that are prefaced by the phrase, "*inter alia.*" That citation form often leaves the Court to guess the basis for defendant's claim. Accordingly, the (cont.)

2

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Detectives Matthew Carey, Joseph Murray, Thomas Gaul, James Dunlap, Ohmarr Jenkins, Tracey Byard, and John Verrecchio, Philadelphia Police Officers Robert Flade, Diertra Cuffie, and Robert Stott, Philadelphia Firefighter Lieutenant Celess Taylor, Delaware State Chief Medical Examiner Dr. Gary Collins, William McGill, Joe Fields, Jessica Nunez, and Laura Nunez. Defendant Muhammed presented the testimony of Philadelphia Police Detectives David Tighe and Frank Mullen, Philadelphia Police Officers Robert Monahan, Daniel Rivera, and Raymond Crespo, Dr. Suzanne Mannes, Dr. Carol Armstrong, Dr. Raquel Gur, Amber Creamer, Jalal Aljuwaie, Gregorio Ortega, Jessica Greenleaf, Amny Rodriquez, Debra Williams, Maryuum Muhammed, Shaquenda Washington, and Kevin Murphy. Defendant Scott presented the testimony of Philadelphia Police Detectives Anthony Anderson, Timothy Dunne, Thomas Gaul, Theodore Hagan, and Joseph Murray, and Shannon Scott. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On September 6, 2011, Porfirio Nunez, his wife Juana Nunez, and his sister Lina Sanchez, were working at their family owned Lorena's Grocery, which was located at the corner of 50th and Parrish Streets in Philadelphia. N.T. 12/7/16 at 223-224, 227. Also working that day were Porfirio and Juana's daughters, Jessica and Laura Nunez. N.T. 12/7/16 at 227.[2] At approximately 7:55 p.m., Porfirio was located by the back refrigerators, while Lina and Juana

---

(cont.) Court will address only those claims apparent from the portion of the record to which defendant actually cites. To the extent that he intends to make additional claims on appeal through the use of the term "*inter alia*" in his citation form, those claims have been waived for lack of specificity. *See Commonwealth v. Cannon*, 954 A.2d 1222, 1228 (Pa. Super. 2008), *app. denied*, 964 A.2d 893 (Pa. 2009) (where a defendant makes a vague and generalized objection on appeal that leaves the trial court to guess at his claims, those claims are deemed to have been waived).

[2] Because the Nunez family share the same last name, they will be referred to throughout this Opinion by their first names.

were in the back food preparation area and Jessica and Laura were at the front registers. N.T. 12/7/16 at 228; 12/8/16 at 216; 12/9/16 at 40. At that time, defendants Ibrahim Muhammed and Nalik Scott entered the store. N.T. 12/7/16 at 228.

Upon entering, Scott went behind the counter where Laura and Jessica were located and grabbed Laura by her hair, while defendant went to the back of the store where Lina and Juana were located. N.T. 12/7/16 at 228-229, 237; 12/8/16 at 216-217, 219-220. After Scott grabbed Laura's hair, he pushed her to the ground, causing Laura and Jessica to scream. N.T. 12/7/16 at 228, 230; 12/8/16 at 216. Hearing his daughters' screams, Porfirio came out to the aisle to see what was going on at the front of the store. N.T. 12/7/16 at 228. Scott, who was in possession of a 9-millimeter handgun, pointed the firearm at Porfirio and shot him through the arm and into his chest. N.T. 12/7/16 at 228, 230-232; 12/8/16 at 193-194; 12/12/16 at 323, 328-329. Porfirio then ran into the back of the store. N.T. 12/7/16 at 228, 232. Hearing the gunshot, defendant then took out his own gun and began shooting Juana and Lina. N.T. 12/7/16 at 233. Defendant shot Lina in her abdomen and back before shooting Juana in the chest and top of her head. N.T. 12/7/16 at 233-236; 12/8/16 at 198-204. Defendant then turned towards Porfirio and shot him three times in the chest and back. N.T. 12/7/16 at 233-236; 12/8/16 at 190.

After shooting Porfirio, Juana, and Lina, defendant walked towards Jessica while Scott, still holding Laura to the floor, yelled at Jessica to "give [him] the money." N.T. 12/7/16 at 234-236; 12/8/16 at 217. Believing that she was about to be shot, Jessica opened the cash register. N.T. 12/7/16 at 236. Defendant and Scott then grabbed what they could from the register before leaving through the front door and fleeing the area. N.T. 12/7/16 at 131-133, 238-239; 12/8/16 at 217.

4

Police responded to the store to find Porfirio, Juana, and Lina laying on the floor inside the store. N.T. 12/6/16 at 270-272. Lina, who was still showing signs of life, was rushed to the Hospital of the University of Pennsylvania. N.T. 12/6/16 at 273-276, 298; 12/8/16 at 201. Juana and Porfirio were similarly transported to the hospital, though they did not show signs of life at the time. N.T. 12/6/16 at 277-278. Jessica and Laura were transported to police headquarters. N.T. 12/6/16 at 281. Police recovered three projectiles and nine 9mm fired cartridge cases from the scene. N.T. 12/6/16 at 203-204, 208-09; 12/12/16 at 322-333. The medical examiner recovered five bullets from the bodies of the victims. N.T. 12/12/16 at 323.

Porfirio was shot a total of five times: twice in his chest, perforating his spleen, diaphragm, vertebrae, and spinal cord; once in his arm and chest, penetrating his left lung, heart, esophagus, and liver; once in his back, penetrating his lungs and vertebrae; and once in his hand. N.T. 12/8/16 at 190, 193-194. Lina Sanchez was shot a total of two times: once in the upper back, penetrating her back, neck, and mouth; and once in the abdomen, penetrating her colon, liver, and right kidney. N.T. 12/8/16 at 198-199. Juana was shot a total of three times: once in the base of her neck; once in her chest, penetrating her left lung, left pleura, and vertebrae; and once in the head, penetrating her brain and vertebrae. N.T. 12/8/16 at 202-204.

In early February, 2012, narcotics police officers observed defendant selling marijuana near the corner of Reedland Street and 62nd Street in Philadelphia, and subsequently arrested him. N.T. 12/9/16 at 106-111. Following his arrest, defendant informed police that he had information about robberies and shootings. N.T. 12/9/16 at 114, 116. Defendant was brought to the Southwest detectives' headquarters and talked with Detective Joseph Murray, who began to believe that defendant may have been involved in the Parrish Street murders at Lorena's Grocery. N.T. 12/9/16 at 149-150, 154. Defendant was then brought to the Homicide Unit,

5

where he was interviewed by Detective Thomas Gaul. N.T. 11/9/16 at 251-252. Defendant was given *Miranda* warnings and ultimately provided a statement inculpating himself in the murders. N.T. 12/9/16 at 254-259, 270; 12/12/16 at 89-99. Defendant admitted to police that he and "Leek" went into the store to rob it, that he was in the back of the store with the women, that he heard a gunshot, and then pulled out his own gun and began firing. N.T. 12/12/16 at 93-94. Defendant stated that he was firing indiscriminately and that he may have shot a man accidentally as he was leaving the store. N.T. 12/12/16 at 94-95. Defendant identified co-defendant Nalik Scott as his co-conspirator in the robbery/homicides. N.T. 12/12/16 at 96.

On February 10, 2012, police detectives prepared a photo spread containing Scott's photograph and brought it to Jessica and Laura, who both independently identified Scott. N.T. 12/7/16 at 272-273; 12/8/16 at 237-238; 12/13/16 at 94-96, 112-113. Later that day, Jessica was brought to police headquarters where she identified defendant in a photo spread. N.T. 12/7/16 at 275-276; 12/13/16 at 97.

## II. DISCUSSION

### A. *Motion to Suppress*

Defendant first alleges that the Court erred in denying defendant's motion to suppress: 1) physical evidence seized during a search of defendant's house; 2) defendant's statement to police; and 3) the subsequent in-court and out-of-court identifications, which were made following the statement. Statement of Errors at ¶ 1. This claim is without merit.

In reviewing a denial of a motion to suppress, the reviewing court must determine if "the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Hoppart*, 39 A.3d 358, 361 (Pa. Super. 2012). The reviewing court may only consider evidence submitted at a suppression

6

hearing. *In re L.J.,* 79 A.3d 1073, 1085 (Pa. 2013). Further, a reviewing court may only consider the evidence presented by the Commonwealth and any uncontradicted evidence of the defendant. *Commonwealth v. Johnson,* 107 A.3d 54, 93 (Pa. 2014).

Here, the evidence adduced at the suppression hearing established the following. In February of 2012, Police Officer Cuffie set up surveillance in the area of the 6200 block of Reedland Street as part of a narcotics investigation. N.T. 11/21/16 at 164-165. On February 6, 2012, Officer Cuffie observed a confidential informant hand money to defendant, who then entered a house at 6215 Reedland Street, and then came out and gave small objects to the informant. The informant returned with 4 packets of marijuana. N.T. 11/21/16 at 165-166. An identical transaction between the defendant and the informant was observed by Cuffie on February 8, 2012, with the informant returning with two more packets of marijuana. N.T. 11/21/16 at 166-168. On February 9, 2012, Cuffie returned with a search warrant for the house. The search revealed a packet of marijuana and drug packaging materials. Defendant was arrested for selling marijuana. N.T. 11/21/16 at 168-169.

While the narcotics team was searching his house, defendant starting telling the officers that he had information that he was willing to share on other crimes in order to get out of being arrested. N.T. 11/21/16 at 169-170. As a result of these statements, defendant was taken to the Southwest Detective Division. N.T. 11/21/16 at 171, 184-185. There he was interviewed by Detective Joseph Murray. Defendant told Detective Murray that he had information about a robbery that had occurred on November 11, 2011, at the Jaquez Grocery at 62nd and Reedland Streets. Detective Murray told defendant that he already knew who did that robbery and could not help defendant with his marijuana case. Hearing that, defendant said that he also had information about a shooting that had occurred on August 7, 2011, during another robbery at the

7

Jaquez Grocery. Coincidentally, Murray was investigating that robbery and shooting, and as he spoke with defendant, Murray came to believe that defendant was one of the perpetrators whom Murray had seen in a surveillance video. N.T. 11/21/16 at 185-187. The police also believed that the shooting and robbery at Jaquez Grocery was related to the Lorena's Grocery murders. N.T. 11/21/16 at 206. As a result of that, defendant was transported to the Homicide Division. N.T. 11/21/16 at 187-190.

At the homicide division, after waiving his *Miranda* rights, defendant gave a statement to Detective Thomas Gaul in which he admitted to participating in the robbery and murders at Lorena's Grocery, and identified co-defendant Scott as his cohort. N.T. 11/21/16 at 234-235. As a result, police showed photo arrays to Jessica Nunez, who identified both Muhammed and Scott as the assailants. N.T. 11/21/16 at 69-77. Laura Nunez was shown only an array containing Scott, since she did not have an opportunity to observe Muhammed. N.T. 11/21/16 at 161-162. Laura identified Scott as one of the assailants from the array. N.T. 11/21/16 at 139-143.

1. Motion to Suppress Physical Evidence

Defendant first contends that the search of his home by narcotics officers was unlawful because the affidavit in support of the search warrant failed to establish probable cause. Motion to Suppress at p. 3. This argument is without merit.

When evaluating whether a search warrant was properly issued, a court is limited to determining whether the magistrate had a "substantial basis" for finding probable cause. *Commonwealth v. Gray*, 503 A.2d 921, 925 (Pa. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). A reviewing court is to view the affidavit in a commonsense, non-technical manner. *Gates*, 462 U.S. at 236. In making this determination, the court may only consider the information that is contained within the four corners of the affidavit. *Commonwealth v. Coleman*,

8

830 A.2d 554, 560 (Pa. 2003) (citing Pa.R.Crim.P. 203(B)). In the case of a search warrant, the magistrate must decide whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Wallace*, 953 A.2d 1259, 1261 (Pa. Super. 2008) (citations omitted); *Commonwealth v. Janda*, 14 A.3d 147, 157-58 (Pa. Super. 2011).

Here, the affidavit of Officer Cuffie in support of the search warrant set forth all of the above-described facts regarding Cuffie's narcotics surveillance of defendant in February 2011. As stated above, she observed two transactions during which defendant took money from the informant, went into the property at 6215 Reedland Street, and then came out and gave small objects to the informant that turned out to be baggies of marijuana. Commonwealth Exh. CM-5 (search warrant affidavit). That was sufficient to establish a fair probability that evidence of a crime would be found at 6215 Reedland Street.

2. Motion to Suppress Statement

Defendant alleges that his statement was illegally obtained since the nature and circumstances of the interrogation rendered the statement involuntary. N.T. 11/21/16 at 61-63. This argument is without merit.

"[T]he standard for determining whether a statement is voluntary is based on the totality of the circumstances and considers, among other things, whether the defendant was coerced or manipulated or promised something in exchange for his confession; essentially...whether the defendant freely made the decision to give the statement." *Commonwealth v. Ogrod*, 839 A.2d 294, 320 (Pa. 2003) (citing *Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998)). "When a defendant alleges that his waiver or confession was involuntary, the question 'is not whether the defendant would have confessed without interrogation, but whether the interrogation was so

9

manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.'" *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1137 (Pa. 2012). The totality of the circumstances includes defendant's mental and physical condition. *Johnson*, 107 A.3d at 93.

Here, the credible testimony of Detective Gaul established that he orally, and again in writing, advised defendant of his *Miranda* rights, including his right to counsel and his right to remain silent. N.T. 11/22/16 at 106. The evidence further established that defendant was held in custody for a few hours at Southwest Detectives, before arriving at Homicide at approximately 7:30 p.m. on February 9, 2012. The Court found that defendant's written statement began at approximately 1:10 a.m. the next morning, and concluded at approximately 5:30 a.m. N.T. 11/21/16 at 224, 229, 234, 237-238; Commonwealth Exhs. CM-1 and CM-4. Defendant was given opportunities to use the bathroom and was given food. There was no evidence presented at the hearing that defendant was abused or mistreated. N.T. 11/21/16 at 242-243. Three experienced members of the police department, that is, Officer Cuffie, Detective Murray, and Detective Gaul, all credibly testified that at all times defendant appeared lucid and not under the influence of any drugs or alcohol. N.T. 11/21/16 at 169, 173-174, 189-190, 230, 243. Moreover, defendant elected not to present any evidence at the hearing that defendant suffered from any kind of mental illness that could have, in some manner, affected the voluntariness of his confession. N.T. 11/22/16 at 61-62.

Accordingly, the record fully supports the finding of the Court that under the totality of the circumstances, defendant knowingly and intentionally waived his rights under *Miranda* prior to providing his statement, and that defendant freely made the decision to give the statement.

N.T. 11/22/16 at 107-108. Therefore, the Court properly found that the statement was voluntarily given, and properly denied defendant's motion to suppress it.

### 3. Motion to Suppress Identifications

Defendant argues that the pretrial identification procedures used by the police were constitutionally defective in that the photo arrays that were used were improperly suggestive and since the detectives conducting the identification procedures made suggestive statements to the witnesses. N.T. 11/21/16 at 63-64.

"A pre-trial identification will not be suppressed as violative of due process unless the facts demonstrate that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Commonwealth v. Carson*, 741 A.2d 686, 697 (Pa. 1999) (quoting *Simmons v. U.S.*, 390 U.S. 377, 384 (1968) (*abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003)); *Commonwealth v. Harris*, 533 A.2d 727, 730 (Pa. Super. 1987), *appeal denied*, 549 A.2d 914 (Pa. 1988). Photographs used in photo arrays are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics. *Commonwealth v. Fulmore*, 25 A.3d 340, 346 (Pa. Super. 2011) (quoting *Commonwealth v. Fisher*, 769 A.2d 1116, 1126–1127 (Pa. 2001)).

The evidence adduced at the suppression hearing demonstrated that pretrial identification procedures use by the police were entirely lawful and proper. As the Court found following the hearing, the photospreads used by the police contained fillers that resembled the defendant and were completely non-suggestive. N.T. 11/22/16 at 108; Commonwealth Exhs. CM-1, CM-2, and CM-3. Moreover, the credible evidence refuted defendant's claim that the detectives acted improperly. Detective Ohmarr Jenkins first presented the photo array containing co-defendant

11

Scott's photograph to Jessica Nunez, who identified co-defendant Scott. Detective Jenkins then transported Jessica to Homicide, where she viewed a photo array containing a photograph of defendant, and Jessica identified defendant in that array. N.T. 11/21/16 at 67-77. Based on the credible testimony of Detective Jenkins, N.T. 11/21/16 at 71, 94-95, the Court found that the police did not coach or direct Jessica to choose either defendant or Scott in making her identifications. N.T. 11/22/16 at 109. Similarly, Detective Byard presented the photo array containing defendant Scott's photograph to Laura Nunez, who identified Scott. N.T. 11/21/16 at 139-143. Detective Byard was unaware of who generated the photo spread, of any descriptions that had been given, or of any confession made prior to showing Laura the photo spread. N.T. 11/21/16 at 145, 155-156. Based on the credible testimony of Detective Byard, the Court found that the police did not coach or direct Laura to choose Scott in making her identification. N.T. 11/22/16 at 109.

Accordingly, the evidence fully supported the Court's finding that there was no police misconduct in conducting the identification procedures, that nothing done was unnecessarily suggestive, and that there was no basis in law to suppress either the out-of-court or in-court identifications of defendant. Therefore, the defendant's motion to suppress the identifications of defendant was properly denied.

### B. Potential Juror Bias Against Muslims

Defendant next alleges that the Court erred in "preventing the defense from inquiring about potential jurors' bias against Muslims." Statement of Errors at ¶ 2. This claim is frivolous.

It is well established that the process of selecting a jury is within the sound discretion of the trial court and will be reversed only where there has been an abuse of discretion.

12

*Commonwealth v. Smith*, 131 A.3d 467, 477 (Pa. 2015). Here, prior to jury selection, the Commonwealth moved *in limine* to preclude defendant from mentioning or discussing during *voir dire* the recent presidential election, bias against Muslims, or other recent political activity, as defendants' religious beliefs were irrelevant at trial. N.T. 11/28/16 at 53. Defendant argued that questioning potential jurors concerning their possible prejudice against Muslims was necessary to ensure that the jury was free of bias against Muslims, particularly since one detective in this case had stated that he recognized defendant Muhammed by his "Osama bin Laden nose." N.T. 11/28/16 at 54-59.

The Court accepted defendants' argument and agreed, over the objection of the Commonwealth, to ask the following question during the group *voir dire*: "Defendants are African-American Muslims. Anything about that fact that would affect your ability to be fair and impartial in this case." N.T. 11/28/16 at 61. Although the Court prohibited individual *voir dire* by the lawyers on that topic, neither defense counsel objected to that restriction. N.T. 11/28/16 at 61-64. Moreover, the Court ruled that anyone answering "yes" to that question would go into the group that the parties had agreed would be dismissed without individual questioning. N.T. 11/28/16 at 64.[3] In fact, over three days of *voir dire*, only one of a total of 300 venirepersons answered that question "yes," and he was dismissed. N.T. 11/30/16 at 47.

Accordingly, the Court agreed to defendants' request to ensure, through *voir dire*, that the jury was free of bias against Muslims. No relief is due.

### C. Dismissal of Jurors Based Upon Their Views of the Death Penalty

Defendant next claims that the Court erred by "automatically disqualifying potential jurors who indicated they would have any moral, religious or conscientious scruples" that would

---

[3] The Court stated that such jurors would go into "group two." N.T. 11/28/16 at 64. All parties agreed that anyone in group two would be excused without individual *voir dire*. N.T. 11/28/16 at 34, 126-127.

prevent them from returning either a life or death sentence without permitting defendant to ask follow-up questions to explore the nature of those potential issues. Statement of Errors at ¶ 3.

Defendant's claim has been squarely rejected by our Supreme Court. *Commonwealth v. Keaton*, 45 A.3d 1050, 1069 (Pa. 2012). In *Keaton*, the defendant claimed, in a petition under the Post Conviction Relief Act, that his trial and appellate counsel were ineffective for failing to challenge the exclusion for cause of venirepersons who affirmatively answered a question as to whether their views on capital punishment would prevent or substantially impair the performance of their duties. The Court acknowledged that it would have been error to automatically excuse potential jurors who simply were opposed to the death penalty. However, if a venireperson's beliefs about the death penalty would either prevent or substantially impair that person's ability to follow the judge's instructions on the law, then further questioning would be fruitless and immediate dismissal of the venireperson without further *voir dire* was entirely lawful. *Keaton*, 45 A.3d 1050, 1069-1070.

Here, the Court's questions were crafted to precisely follow the formulation sustained in *Keaton*. The Court only excluded those jurors whose views on the death penalty would prevent or substantially impair them in following the Court's instructions regarding the imposition of the death penalty. N.T. 11/28/16 at 120, 123; 11/29/16 at 81, 83-84; 11/30/16 at 58, 60. Under *Keaton*, this process was clearly permitted under the law.

*D. Denial of Batson Motion*

Defendant next claims that the Court "erred by denying the defense's *Batson* motion. *See, inter alia*, N.T. 11/28/16, 437." Statement of Errors at ¶ 4. This claim is without merit.

It is well-settled "that the government denies a defendant equal protection of the laws when it 'puts him on trial before a jury from which members of his race have been purposefully

14

excluded.'" *Commonwealth v. Uderra*, 862 A.2d 74, 83 (Pa. 2004), (citing *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). *Batson* established a three-part inquiry for evaluating a defendant's claim of racial discrimination in jury selection:

> First, the defendant must make out a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Uderra*, 862 A.2d at 83 (citing *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)); *Commonwealth v. Harris*, 817 A.2d 1033, 1042 (Pa. 2002). To satisfy its obligations during the second part of the *Batson* inquiry, the Commonwealth need not provide explanations that are "persuasive or even plausible." *Commonwealth v. Roney*, 79 A.3d 595, 619 (Pa. 2013) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995)). "Rather, the issue at [the second] stage 'is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reasons offered will be deemed race neutral.'" *Id.* Once race-neutral explanations are provided, the "persuasiveness of the facially neutral explanation proffered by the Commonwealth is relevant" and the court is to make a determination as to whether the moving party has proven purposeful discrimination. *Id.* (quoting *Commonwealth v. Williams*, 980 A.2d 510, 529-530 (Pa. 2009)).

Here, defendant raised a *Batson* motion following the Commonwealth's fifth preemptory challenge. N.T. 11/28/16 at 437; Statement of Errors at ¶ 4. At that time, the Commonwealth's first preemptory challenge had been used on a Caucasian venireperson, while the following four preemptory challenges had been used on African-American venirepersons. N.T. 11/28/16 at 437-439. The potential juror pool consisted of nine Caucasians, nine African-Americans, and four Hispanic venirepersons. Hence, there were equal numbers of Caucasians and African-

Americans in the pool, and African-Americans accounted for 41% of the available jurors following the group *voir dire*.[4] However, of the six individuals chosen for the jury, four, or 67% were African-Americans and neither defendant had struck any African-American venirepersons. N.T. 11/28/16 at 440-442, 446-451. Accordingly, the percentage of African-Americans selected to be on the jury substantially exceeded the percentage of African-Americans in the panel. Considering all this data, the Court found that defendant had not established a *prima facia* case of purposeful discrimination. N.T. 11/28/16 at 451.

However, the Court nevertheless requested that the Commonwealth provide race-neutral explanations for its peremptory challenges, which were as follows:

1) Juror number 4 was a Caucasian individual whose wife was a public defender. N.T. 11/28/16 at 452.

2) Juror number 55 stated that she was living in Washington D.C. and that, while living there, served as a juror in at least two cases in Philadelphia, despite not living in Philadelphia at the time. N.T. 11/28/16 at 452-453.

3) Juror number 61 worked at the Curran-Fromhold Correctional Facility, one of Philadelphia's prisons, and assessed inmates concerning their medical needs and mental health issues. N.T. 11/28/16 at 452-454.

4) Juror number 79 continually stared at one of the prosecutors, even while being questioned by the Court and by defense counsel, not making eye contact with the person questioning him. This strange manner of communicating led the prosecutor to

---

[4] The remaining venirepersons were dismissed without individual *voir dire* by agreement of the parties, apart from those whom the Court dismissed due to their answers to the death penalty questions described in Section II(C), above. As stated in that section, the Court properly dismissed those venirepersons who affirmatively answered the death penalty questions over the objection of the defendants.

believe that this juror would not be able to engage other jurors in a normal fashion. N.T. 11/28/16 at 454-455.

5) Juror number 85 appeared very young and spoke in an immature manner that led the Commonwealth to believe that she lacked the life experience necessary to be a good juror in a capital homicide trial. She also had little work experience and still lived with her mother. N.T. 11/28/16 at 456-458.

The Court found each of these explanations to be credible, race neutral explanations for the Commonwealth's preemptory challenges. The Court therefore found that defendant did not present a *prima facia* case of juror discrimination and that, even if there were a *prima facia* case of racial discrimination, the Commonwealth did not exercise its preemptory challenges on the basis of race. Accordingly, the Court found that defendant failed to meet his burden to prove purposeful discrimination. Since the record fully supports these findings, the Court did not err in denying defendant's *Batson* motion.

### E. Permitting Prosecution to Refer to Defendants as "Evil" and Appeal to Emotion and Racial Bias

Defendant next claims the following: "The Honorable Trial Court erred by permitting the prosecutor to, during opening argument, repeatedly refer to the defendants as 'evil' with the object of prejudicing the jury against the defendants. *See, inter* alia, N.T. 12/6/2016, 50-51. Moreover, the Honorable Trial Court erred by permitting the prosecutor to commit misconduct by consistently making appeals to emotion and racial bias throughout the trial. *See, inter alia,* N.T. 12/21/2016, 33-34." Statement of Errors at ¶ 5. These claims are without merit.

1. Referring to Defendants as "Evil"

In the Commonwealth's opening argument, the district attorney commented that "evil arrived in [the] store" and that Laura Nunez "looked into the face of evil." N.T. 12/6/16 at 50-

17

51. Defendant now contends the Court erred by "permitting" the prosecution to refer to the defendants in this fashion. The record demonstrates, however, that the Court never made any ruling "permitting" these two references. To the contrary, neither defendant objected during the Commonwealth's opening. N.T. 12/6/16 at 49-70. When defendant requested a curative instruction after the opening, the Court agreed to do so, and instructed the jury as follows:

> In addition, you heard some comments from the prosecutor where he made some references and used the word "evil," and I just want to be clear, ladies and gentlemen, that was not appropriate, that you need to be dispassionate and consider the evidence without being overwhelmed by emotion or anything else. Your job is to simply look at the facts, look at the evidence, and determine whether or not the Commonwealth has proved guilt beyond a reasonable doubt. That's your job.

N.T. 12/6/16 at 123. Both defense counsel accepted this instruction. N.T. 12/6/16 at 123. Of course, defendant cannot properly attribute error to the Court for a ruling that the Court never made.

## 2. Appeals to Emotion and Racial Bias

Defendant also claims that the Court erred by permitting the prosecutor to make appeals to emotion and racial bias. While defendant complains that this was done "throughout the trial," he directs the Court to only one instance in the prosecution's closing argument. Statement of Errors at ¶ 5 (citing to "*inter alia,* N.T. 12/6/2016, 33-34"). While the citation includes the phrase, "*inter alia,*" the trial court is not required to comb through the 14 days of trial testimony in an effort to guess what the defendant is objecting to on appeal. To the extent that defendant's claim concerns conduct of the prosecutors at some time other than the cited closing argument, the claim is waived for vagueness. *See* Note 1, p.2 *supra; Cannon,* 954 A.2d at 1228.

"It is well-established that 'comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias

18

and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.'" *Commonwealth v. Arrington*, 86 A.3d 831, 853 (Pa. 2014) (quoting *Commonwealth v. Bryant*, 67 A.3d 716, 727 (Pa. 2013). As our courts have repeatedly stated, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (quoting *Commonwealth v. Chmiel*, 889 A2d. 501, 544 (Pa. 2005).

During the trial, the defense presented testimony from Dr. Suzanne Mannes, who was qualified as an expert concerning eyewitness identifications. She testified that the accuracy of an identification may be affected by the races of the victim and the perpetrator, and that individuals have a greater probability of making a mistake in identifying someone of a race other than their own. This was offered to challenge the identifications of the defendants, who are African-American, by Laura and Jessica Nunez, who are Hispanic. N.T. 12/15/16 at 99-101. The prosecutor responded to this evidence in the following argument, which is the basis for defendant's current claim:

> You had that expert from the university telling us, Latin people, we can't tell black people apart. You've ever gone to Puerto Rico or look at Cuba or the Dominican Republic? Okay. Native Americans were there first, then the Spaniards come, and when they die out, they bring the slaves. Our culture is so immersed with Africa. Look at our music, conga, bongos. Okay. We know black people. We got soul. We are them. They can't tell? No, but you have this white lady say, "They can't. I know. I work in a university." Complete out of touch with reality. Of course, she don't live in the 'hood. She's not from the Dominican Republic.
>
> Think baseball players. How many Dominican baseball players look black because they are black, except they speak Spanish? American blacks speak English. It's where you grew up. So they can tell.

N.T. 12/21/16 at 33-34.

19

Following the Commonwealth's closing, defendant objected to the above argument on the ground that it mischaracterized the testimony of Dr. Mannes. In particular, defense counsel argued that Dr. Mannes only talked about cross-racial identifications in a general sense, and never stated that "Latin people can't tell black people apart." N.T. 12/21/16 at 91. Defense counsel, however, was wrong. Dr. Mannes specifically testified that because the Nunez sisters were Hispanic and were identifying African-Americans, they were more likely to have made a misidentification. N.T. 12/15/16 at 100-101. Accordingly, the record demonstrates that the challenged statements of the prosecutor in his closing were neither an appeal to emotion nor an appeal to racial bias; they were a direct response to the arguments based on race that were introduced by the defendants. While the statements certainly devolved into oratorical flair, they did not mischaracterize the testimony of the defense expert and did not improperly appeal to emotion or racial bias. No relief is due.

F. *Permitting Commonwealth to Lead Key Witnesses and Denying Opportunity to Cross-Examine*

Defendant next claims the following: "The Honorable Trial Court by allowing the prosecutor to impermissibly lead key witnesses during direct examination over numerous sustained defense objections to the impermissible conduct, such that the defense was prejudiced. *See generally* N.T. 12/7/2016, N.T. 12/8/2016. Moreover, The Honorable Trial Court erred by denying the defense a full and fair opportunity to cross examine Commonwealth witnesses regarding their perception and memory of the incident. *See, inter alia,* N.T. 12/9/2016, 54-90." Statement of Errors at ¶ 6.

20

1. Leading Witnesses

Defendant argues that he was prejudiced by the Court allowing the prosecutors to ask leading questions. However, instead of citing the Court to the objectionable questions, the defendant merely cites to two full days of trial testimony. Statement of Errors at ¶ 6. The trial court is not required to peruse two days of testimony, which covered six witnesses, to guess which rulings the defendant intends to challenge on appeal. This claim is waived. *See Cannon,* 954 A.2d at 1228.

In any event, the Court has wide discretion to reasonably control the mode and order of examining witness and the presentation of evidence, including the use of leading questions on direct examination. *See* Pa.R.E. 611(a); *Commonwealth v. Lambert,* 765 A.2d 306, 360 (Pa. Super. 2000). No relief is due.

2. Denial of Full Cross-Examination

Defendant next argues that he was denied a full and fair opportunity to cross-examine Commonwealth witnesses regarding "perception and memory of the incident." While he refers to Commonwealth "witnesses," he cites the Court only to the entire cross-examination of witness Laura Nunez. Statement of Errors at ¶ 6. During that cross-examination, the Court sustained only three objections to questions asked by defense counsel.

First, counsel for co-defendant Scott inquired about Laura's recollection of the appearance of a police officer who interviewed her several months after the murders. N.T. 12/9/16 at 52-55. Laura first responded to counsel's question regarding the race of the officer by stating that he was white. After that, the following occurred:

| | |
|---|---|
| **[Defense counsel]:** | Any other description of that white officer? |
| **[Laura Nunez]:** | That's all I remember. |
| **[Defense counsel]:** | I'm just curious. Why is it you don't remember? |
| **[Prosecutor]:** | Objection. |

21

N.T. 12/9/16 at 54. The objection was properly sustained since Laura's ability to recall the appearance of an officer who interviewed her months after the incident was irrelevant to her ability to recall the murders. N.T. 12/9/16 at 55. This was seemingly apparent to the questioner, who prefaced the question with the phrase, "I'm just curious." Counsel's curiosity is not a valid basis for a question.

The next objection occurred when Scott's counsel made a similar inquiry about the appearance of a detective who interviewed Laura on the same day as the interview with the officer described above:

> **[Defense counsel]:** Was it a black detective or a white detective?
> **[Laura Nunez]:** It was a black detective.
> **[Defense counsel]:** What did he look like?
> **[Prosecutor]:** Objection.

N.T. 12/9/16 at 57. The Court properly sustained the objection since the question objected to, like counsel's first question addressed above, pertained to only the appearance of one of the investigators and was completely irrelevant. N.T. 12/9/16 at 57.

Finally, counsel for defendant asked one question that was not allowed, as follows:

> **[Defense counsel]:** Okay. So this man, who is behind you, grabbed you at a place that is on your hair that is close to the back of your head, he is allowing you to stare at him for five seconds with your head still?
> **[Prosecutor]:** Objection.

Prior to asking this question, defense counsel had extensively covered precisely the same ground: that the attacker had grabbed Laura's hair behind her head and held it, and that she looked at his face for at least five seconds. N.T. 12/9/16 at 69-71. Because the question had already been asked and answered, it was properly not allowed. *See Commonwealth v. Conde*, 822 A.2d 45, 51

22

(Pa. Super. 2003) (trial court may limit cross examination to prevent repetitive inquiries and cumulative answers).

Moreover, immediately after the Court sustained the objection, counsel rephrased the question and covered the exact same ground in a question to which there was no objection:

> **[Defense counsel]:** Well, let me phrase it a different way because that was probably phrased poorly. Your testimony is that you're looking in the face of this man, who has control over you by the back of your head by holding your hair, and during those five seconds he's looking back; right?
> **[Laura Nunez]:** Yes.

N.T. 12/9/16 at 71. Counsel then followed up on the same topic with several additional questions that did not elicit an objection. N.T. 12/9/16 at 71-72.

Accordingly, defendant's claim that counsel were denied a fair opportunity to cross-examine witnesses regarding perception and memory of the incident is refuted by the record. No relief is due.

### G. Denial of Motion to Preclude Expert Testimony on Video Quality

Defendant next alleges that the Court erred in denying defendant's motion to "preclude the Commonwealth from presenting expert testimony concerning the quality of a video relevant to the defense's case" as the expert's report was untimely, the testimony was irrelevant, and caused prejudice to defendant. Statement of Errors at ¶ 7. This claim is waived.

Under Pa.R.Crim.P. 573, the Commonwealth has a continuing duty to disclose any expert report material to the case. Where violations of this rule occur, the Court is empowered to "enter such other order as it deems just under the circumstances."

Here, the Commonwealth sought to admit expert testimony, during the course of trial, from Detective James Dunlap concerning his seizure of video surveillance footage as well as testimony concerning the video quality. N.T. 12/9/16 at 93-95; 12/12/16 at 79-81. Co-defendant

23

Scott objected to the introduction of this testimony as the Commonwealth had not submitted an expert witness report prior to trial and because Scott would be prejudiced by this testimony since he had already presented opening arguments concerning the video. N.T. 12/9/16 at 93, 95-99; 12/12/16 at 81-83. Defendant joined in this motion. N.T. 12/9/16 at 98-99. Following arguments, the Court permitted Detective Dunlap to testify concerning video pixilation, quality, and compression, while prohibiting Detective Dunlap from discussing specific aspects of what was depicted in the video. N.T. 12/12/16 at 352-353.

Following Detective Dunlap's testimony, the Court placed on the record that it had not heard any testimony that was objectionable or would have prejudiced defendant, or even that required that Detective Dunlap to be qualified as an expert. N.T. 12/13/16 at 88-89. Co-defendant Scott explicitly agreed that the evidence presented by Detective Dunlap was proper and withdrew his objections. N.T. 12/13/16 at 89-90. Defendant, who had joined with Scott on this motion, remained silent and did not object to the Court's ruling. *Id.* Accordingly, defendant waived this claim for purposes of appeal.

*H. Testimony and Argument Regarding Fear and Intimidation*

Defendant next alleges the following: "The Honorable Trial Court erred by permitting the prosecutor to impermissibly elicit irrelevant and highly prejudicial testimony concerning witness' fear of testifying and other evidence related to witness intimidation. Moreover, the ... Court erred in permitting that line of questioning. *See, inter alia,* N.T. 12/16/2016, 164-167, 249; N.T. 12/20/2016, 45." Statement of Errors at ¶ 8. Defendant further asserts that the Court "erred by allowing the prosecutor to impermissibly argue inflammatory evidence not of record concerning a witness' failure to identify the defendant at a line-up due to his fear of defense

24

counsel or other motivations not of record. *See, inter alia*, N.T. 12/21/2016, 41-46." Statement of Errors at ¶ 8. These claims are without merit.

### 1. Evidence of Witness Intimidation

First, defendant claims that the Court erred in admitting evidence of fear or intimidation of witnesses at trial. In particular, defendant cites to the testimony of defense witnesses Gregorio Ortega and Amny Rodriguez. Their testimony pertained to two robberies that were not charged in this case: 1) a robbery on July 25, 2011 at a grocery store at 2000 N. Gratz Street; and 2) a robbery on August 7, 2011 at a grocery store on the corner of 62nd Street and Reedland Street. These were two robberies that defendant admitted to committing in his statement to police, along with the charged robbery and murders at Lorena's Grocery. Even though the Commonwealth offered no evidence of these other two robberies in its case-in-chief, the defense presented evidence that the defendants did not commit these robberies in order to prove that defendant's entire confession was false. In the testimony here at issue, the Court permitted the Commonwealth to elicit that each of these witnesses felt threatened and was fearful to testify. N.T. 12/14/16 at 10, 22-23, 111-112; 12/16/16 at 164-166. Defendant also bases his claim on the Court's decision to permit the Commonwealth to prove that someone had taken photographs of the courtroom and the courthouse lobby during the trial that had been posted to the Facebook page of co-defendant Scott.

Evidence that a witness had been threatened or intimidated may admissible for two purposes. If the threats or intimidation can be linked to the defendant, then evidence of the threats or intimidation is admissible to establish a defendant's consciousness of guilt. *Commonwealth v. Flamer*, 53 A.3d 82, 86-87 (Pa. Super. 2012). Even when the threats or intimidation cannot be linked to the defendant, they may still be admissible if they are offered to

25

explain the behavior of a witness who has given differing versions of the facts. *Commonwealth v. Collins*, 702 A.2d 540, 544 (Pa. 1997); Commonwealth v. Bryant, 462 A.2d 785, 788 (Pa. Super. 1983). When the evidence is admitted solely to show its effects on a witness, a limiting instruction is appropriate if requested by the defense. *Collins*, 702 A.2d at 788.

Here, while there was no evidence that either defendant threatened or intimidated witnesses Ortega or Rodriguez, each of these witnesses provided trial testimony that contradicted earlier testimony or sworn statements. N.T. 12/14/16 at 24-27, 66-71; 12/16/16 at 153-155, 158-159.. Accordingly, it was entirely proper for the Commonwealth to present the evidence that these witnesses had been intimidated. Moreover, without any request having been given, the Court elected to give an appropriate limiting instruction after Rodriguez testified that she feared for her safety:

> Ladies and gentlemen, I'm admitting that only to the extent that, if you find that that was said, to the extent that you find it helpful in evaluating the behavior and testimony of this witness.
>
> There's been no evidence that any of that has anything to do with these two defendants, and so you may not infer from anything that you just heard that that is evidence of consciousness of guilt or misconduct on the part of the defendants. There's been no evidence of that. You understand the limited purpose for which I've allowed it.

N.T. 12/16/16 at 164-167.[5]

The evidence of the photographs of the trial and courthouse posted to co-defendant Scott's Facebook page corroborated the testimony of both Ortega and Rodriguez regarding their fear and intimidation. In particular, Ortega had testified that he specifically felt threatened because he believed that people were using cellphones to take his picture. N.T. 12/14/16 at 110-112. After the evidence from Facebook was presented to the jury, the Court once again, gave a clear limiting instruction:

---

[5] No limiting instruction was requested during the testimony of Ortega as well.

[Y]ou just saw those photographs that were on Scott's Facebook page of this courtroom. That evidence is admissible for one purpose only, that is to say on the issue of whether any witnesses in this case were intimidated in this case.

You may not consider the evidence that you just saw as evidence of consciousness of guilt on the part of the defendants, since there's no evidence in this case that the defendants were responsible for those postings on Scott's Facebook page.

So the only reason you may consider it, to the extent that you find it's probative of the issue, is on whether witnesses who testified here were intimidated.

N.T. 12/20/16 at 48.

Accordingly, the evidence of intimidation was properly admitted for the limited purpose permitted under the law, along with appropriate limiting instructions. No relief is due.

2. Closing Argument on Intimidation

Second, Defendant claims the Court erred in permitting the Commonwealth to argue concerning "a witness' failure to identify the defendant at a line-up due to his fear of defense counsel or other motivations not of record. *See, inter alia*, N.T. 21/21/16 at 49-52." Statement of Errors at ¶ 8. This argument is without merit.

At trial, Ortega testified that he could "possibly" identify one of his assailants, but that he was "not going to do it again, no;" that he was afraid, and that, when confronted with the possibility of serving time in jail after a contempt citation, he was willing to go to jail. He stated "the only thing I need to be is dead. I feel threatened. I'm scared to testify." N.T. 12/14/16 at 22-23. However, Ortega did eventually identify the defendants as the individuals who robbed the Gratz Street store. N.T. 12/14/16 at 24-27. After that, defense counsel questioned Ortega about his failure to identify defendant, and his identification of a different person when he was shown a photospread at police headquarters on August 11, 2015, while counsel for defendant was present. N.T. 12/14/16 at 60, 67-71. The prosecutor addressed this misidentification in his closing argument as follows:

27

So now comes that photo spread, and you see the photo spread speaks volumes. In that photo spread, although he ID'd them already, Mr. Krasner's there. Now, in all those times he comes to court, he knows that's the lawyer for one of them, and at that photo spread that lawyer is there.

What does he do? He's not dumb. He may not speak English but he's not dumb. Let me purposefully not identify Muhammed so I don't have to come back. Because when you take this, ask to take it, read it. He describes everybody. But of all people, when they get to Muhammad [sic], he says this: "Do you recognize this person?"

"No, I don't have any idea of this guy. He doesn't look like anybody." He's saying, please, I'm going to mess this up. I'm going to say it's not him that way I don't have to come back anymore. That speaks volumes to say, "I know him, and I'm purposefully going to say I can't ID him because I don't want to come back." And you know how bad he doesn't want to come back? When he came here, he didn't want to identify anyone. He says, "I don't want to talk. I don't want to identify. I don't want to be involved."

And the judge says, "I'm going to hold you in contempt. I could put you in jail."

What does he say? "Put me in jail. Put me in jail because I don't want to talk against these guys."

Then we took a break, and then he told you, "Those guys robbed me."

N.T. 12/21/16 at 51-53. This was a completely fair argument based on the evidence presented at trial. Ortega did testify, on multiple occasions, that he did not wish to testify, did not want to be involved in this matter, and that he would rather go to jail than testify. N.T. 12/14/16 at 10-11, 22-27. Ortega also identified defendant prior to trial, only to later misidentify defendant during an identification procedure with defense counsel present. N.T. 12/14/16 at 28-33, 60, 68-71. Accordingly, the prosecutor's comments were based on the evidence or inferences therefrom. *Judy*, 978 A.2d at 1020. No relief is due.

*I. Argument Regarding Defendant's Wealth*

Defendant next asserts that the Court erred by permitting the Commonwealth to argue, in closing arguments, "that defense counsel were wealthy and that defendants had hired expensive

28

defense lawyers and experts to defend them, in contrast to the prosecutor's more meager finances, in an attempt to inflame the prejudices of the jury. *See, inter alia*, N.T. 12/21/2016, 41-46." Statement of Errors at ¶ 9. This claim is without merit.

As stated above, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Judy*, 978 A.2d at 1020. The portion of the record cited by defendant indicates that the Commonwealth was not arguing that defense counsel were wealthy, but that the expert witnesses hired by defendant were biased because they were hired to testify. During closing arguments, the prosecutor made the following statements in regards to the expert witnesses presented by defendant:

First, in discussing defendant's trial strategy in general: "Let's call the experts. Let's talk about the best defense money can buy." N.T. 12/21/16 at 41.

Second, speaking of Dr. Gur: "Any studies that ethnically you are surrounded and you are part black? It's our culture. She didn't say that. But you know what? When you get paid money, you can say whatever." N.T. 12/21/16 at 41.

Third, speaking of Dr. Armstrong:

And then when she's asked the question, how much are you getting paid for this, "I don't know."
"Give me a round number."
"I don't know." She's the smartest person in the universe. She tells you, "I don't know how much I'm making."
Well, money is the bottom line. She doesn't know how much she's going to charge?

N.T. 12/21/16 at 43.

And fourth, again speaking of Dr. Gur:

**Mr. Vega (for the Commonwealth)**: What does Dr. Gur say? "I got $15,000," $15,000 for one hour and 20 minutes. Let's say it's two hours. Two hours and you read a report. And I'm thinking, "Here I am since Thanksgiving, trying this case." You see how long

we're working, we're coworkers, we're leaving at five. When you're gone, I'm still battling. The earliest I leave the office, me and Kirk, 8:00, 8:00. Even this past Saturday I had to drive to Mr. McMahon's house because he needed something. So 9:30 on a Saturday, rather than Christmas Shopping, I got to go to him. And I'm thinking, wow, from Thanksgiving until now, our combined salary isn't $15,000. Our combined salary isn't $10,000, so –

**Mr. McMahon (for defendant Scott)**: Judge, I object.

**Mr. Vega**: -- you give me 15,000 –

**Mr. McMahon**: I object to –

**Mr. Voci (for defendant Muhammed)**: Objection.

**Mr. McMahon**: This part is just beyond the pale.

**The Court**: Your salary isn't part of the record, so I'll –

**Mr. Vega**: You're right.

**Mr. McMahon**: Driving to my house isn't part of the record or any of that.

**The Court**: Everybody went beyond the record a little bit. I'll direct him to move on.

**Mr. Krasner (for defendant Muhammed)**: Judge, he's well aware of how that doctor got paid. He's misrepresenting –

**The Court**: Wait, wait, wait. Listen. You can make an objection, but your time to close is over, so please don't do that again. All right.

**Mr. Krasner**: I object. I request the Court instruct the jury in how Dr. Gur got paid. It's a misrepresentation.

**The Court**: How she got paid, I thought the issue was how much she got paid. Anyway, your objection is overruled.
Go ahead.

**Mr. Vega**: Thank you.
I'm sorry. She made a lot of money. I wish I had a lot of money.

**Mr. Krasner**: Objection.

**Mr. McMahon**: Objection.

**Mr. Vega**: I wish –

**The Court**: Look, it's argument. He's talking about potential bias of an expert which is proper argument, so your objection is overruled.

N.T. 12/21/16 at 44-46.

It is well-established that it is proper to ask expert witnesses about their compensation in order to show potential bias. *See, e.g., Commonwealth v. Thompson*, 93 A.3d 478, 491 (Pa. Super. 2014). Similarly, it is entirely proper to demonstrate and argue to the jury that an expert may be biased because the expert has only been hired by the defense, and never by the prosecution. *See Commonwealth v. Smith*, 995 A.2d 1143, 1162-63 (Pa. 2010) (prosecutor's

statements that defense expert was a "hired gun" was fair comment where the expert had only testified for the defense).

Apart from the prosecutor's complaints about his salary and work hours, the above arguments by the Commonwealth were properly based on the evidence adduced during the trial. Dr. Gur testified that she had testified on behalf of defendants on three occasions, and that she had not ever testified on behalf of the prosecution. N.T. 12/19/16 at 61-64. Dr. Gur testified that she met with defendant Muhammed on one occasion, July 27, 2016, for approximately an hour and a half. N.T. 12/19/16 at 66-67, 71. Dr. Gur also testified that her budget for this matter was $15,000.00. N.T. 12/19/16 at 120. Similarly, Dr. Armstrong testified that she had testified exclusively on behalf of criminal defendants, and never testified on behalf of the prosecution. N.T. 12/16/16 at 58-60. Dr. Armstrong also testified that she could not approximate how much she had been paid over the years testifying on behalf of the Federal Defender's Office. N.T. 12/16/16 at 88-90.

Accordingly, the prosecutor's statements that the defense experts "can say whatever" when they are paid, that "money is the bottom line" and that Dr. Gur "made a lot of money" were arguments based on the evidence adduced at trial. While the prosecutor's statements concerning his own salary and hours were beyond the record in this matter, after defendant objected, the Court properly instructed the prosecutor to move on. Defendants could not have been prejudiced by these momentary complaints by the prosecutor about his salary and hours. No relief is due.

*J. National Cases of Defense Expert Witness*

Defendant next claims that the Court "erred in permitting the prosecutor to agree to limit his cross examination of a defense medical expert witness with regard to other, nationally

31

recognized cases she has handled in the past to the state and year those cases occurred because to do otherwise would solicit irrelevant and prejudicial testimony, then deliberately solicit said information and also impermissibly put before the jury a video indicating the expert's involvement in a nationally recognized sensational case. *See, inter alia*, N.T. 12/19/2016, 21; 62; 80-81." Statement of Errors at ¶ 10. This claim is without merit.

Defendant is referencing the testimony of Dr. Gur. Prior to the commencement of Dr. Gur's trial testimony, the Commonwealth informed defendant that it would be cross-examining Dr. Gur concerning her methodology based on prior testimony from the case *Colorado v. James Holmes*, which involved a defendant who had conducted a mass shooting at a theater in Colorado, and possibly other cases. Defendant moved to preclude the Commonwealth from questioning Dr. Gur concerning the identity of those cases, and specifically that the testimony had come from the theater shooting case. N.T. 12/19/16 at 20-21. The Commonwealth indicated that it only intended to name the state and time of the cases, and the Court ordered the Commonwealth to limit its questioning to those specifics. N.T. 12/19/16 at 21. However, during cross-examination, the Commonwealth asked if Dr. Gur had testified "just last summer in Colorado in the State of Colorado versus James Holmes, the theater shooter." N.T. 12/19/16 at 62. Defendant immediately objected, and the Court sustained the objection. *Id.* The Commonwealth later attempted to cross-examine Dr. Gur using a video of her testimony in the Colorado case in an attempt to discredit her methodology. N.T. 12/19/16 at 76-77. However, outside the presence of the jury, defendant objected to use of the video as the video included a graphic which contained the Seal of Colorado as well as the text "Live Theater Shooting Trial." N.T. 12/19/16 at 81-82. The Court again sustained the objection and precluded the

32

Commonwealth from using the trial video. N.T. 12/19/16 at 86-87. Defendant did not request any additional relief.

Accordingly, the record is clear that the Court sustained defendant's objections and did not permit the Commonwealth to use the offending video or otherwise identify the other cases in which Dr. Gur had testified. No relief is due.

### K. Evidence of Failure to Provide Alibi Notice

Defendant next claims that the Court "erred by allowing the prosecutor to impermissibly introduce evidence that defense counsel was deficient in failing to provide [notice of] 'alibi' in a timely manner" as the evidence was not alibi evidence. He also contends that the Court erred by not permitting the defense to respond with a definition of alibi, and by permitting the Commonwealth to make arguments concerning alibi. Statement of Errors at ¶ 11. This claim is without merit.

Alibi is a defense which "places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." *Commonwealth v. Ali*, 10 A.3d 282, 316 (Pa. 2010) (quoting *Commonwealth v. Johnson*, 966 A.2d 523, 538 & n. 5 (Pa. 2009). The right to present alibi testimony is not absolute. *Commonwealth v. Poindexter*, 646 A.2d 1211, 1218-19 (Pa. Super. 1994). Under Pennsylvania Rule of Criminal Procedure 567, a defendant is required to file a notice of alibi with the clerk of court no later than the time required for filing the omnibus pretrial motion. Such notice is required to "contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense," as well as the names and addresses of any witnesses whom the defendant intends to call in support of the claim. *See* Pa.R.Crim.P. 567(a); *Poindexter* 646 A.2d at 1218-19. The purpose of the alibi notice is to

33

insure "both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." *Commonwealth v. Lyons,* 833 A.2d 245, 257 (Pa. Super. 2003 (internal citations omitted).

Should the defendant fail to file such a notice, or should any witness be omitted from the notice of alibi, the trial court is given discretion to exclude the testimony of the proffered witness other than the defendant, grant a continuance to enable the Commonwealth to investigate the witness, or may make such other order as the interests of justice require. *See* Pa.R.Crim.P. 567(b); *Poindexter* 642 A.2d at 1219 (citing *Commonwealth v. Anthony,* 546 A.2d 1122 (Pa. Super. 1988)). One such remedy available to the Court is to permit the alibi testimony and instruct the jury that the defendant did not provide the proper alibi notice, permitting the Commonwealth to explain why it was unprepared to rebut this testimony. *See Commonwealth v. Servich,* 602 A.2d 1338, 1343 (Pa. Super. 1992).

Here, there were three separate criminal episodes at issue in the case: 1) the robbery and murders at Lorena's Grocery that were the subject matter of the charges; 2) the Gratz Street grocery store robbery; and 3) the Reedland Street grocery store robbery. As stated above, the Commonwealth only offered evidence of the robbery and murders at Lorena's Grocery. Evidence of the other two uncharged robberies was offered by the defense to prove that Muhammed's confession to all three robberies was false. The alibi notice issue arose as to the Reedland Street robbery only. During the trial, defense counsel asked for a sidebar conference and informed the Court that the next witness, as well as one additional witness, would provide defendant with an alibi for the Reedland Street robbery. The defense argued that no alibi notice was required because the Reedland Street robbery was not charged. The Commonwealth objected and argued that notice was required, and that defendant's failure to provide such notice

34

prevented the Commonwealth from investigating the purported alibi. It was agreed that the defense was aware of the alibi evidence at least two weeks prior to calling the first alibi witness, but did not disclose the alibi until immediately before the witness's testimony. N.T. 12/16/16 at 171-179. The Court ruled that the alibi testimony would be allowed to come in, but that the Commonwealth would be permitted to advise the jury of the date that it had learned about the alibi, that the Rules require a notice of alibi, and that no notice had been timely given. N.T.12/19/16 at 202-206; N.T. 12/20/16 at 65-67.[6]

It is true, as defendant argued, that Rule 567, by its terms, does not explicitly state whether alibi notice is required for uncharged crimes that are at issue in the case. Nor does there appear to be any Pennsylvania authority on this issue. However, there are several compelling reasons that support the Court's ruling in this case.

First, the purpose of the rule, as stated above, is to give all parties an opportunity to investigate facts that are crucial to the outcome of the case. Where, as here, all parties are well-aware that multiple criminal episodes are integrally involved in the case, the Rule should require notice of alibi for all crimes to avoid the evil that the Rule is intended to prevent: a disruptive presentation of alibi evidence during the trial that would either require a mid-trial continuance or preclude the prosecution from reasonably investigating the purported alibi.

This is particularly true where, as here, the uncharged crimes are inextricably intertwined with the charged conduct. Defendant's strategy was to undermine the probative value of defendant's statement to police by demonstrating that he did not commit two uncharged robberies that he had confessed to at the same that he had admitted to the robbery/murders that had been charged. Under these circumstances, the alibi for the Reedland Street robbery was just

---

[6] The Court initially ruled that the defense could not present the alibi evidence due to the lack of notice. N.T. 12/16/16 at 179. However, the Court reversed that ruling, and the alibi evidence was presented. N.T. 12/19/16 at 202-204.

as relevant to defendant's culpability as an alibi to the Lorena's Grocery murders would have been.

Moreover, defense counsel was well aware that he was required to provide notice of alibi for all three criminal episodes. The fact that neither defendant had filed such a notice was raised by the Commonwealth prior to jury selection. N.T. 11/28/16 at 78. In response, counsel for defendant stated, among other things, the following:

> So, no, we don't have explicit information that would show that at the time of the murder/*robberies* the defendant was in another location based upon bank records or anything else, but I can't tell you it's impossible to show up at some point. We simply haven't located anything to establish that, and defendant's memory is quite unreliable. Mr. Vega [the prosecutor], please, come on. I'm not intending to jackpot some alibi in the middle of the trial.

N.T. 11/28/16 at 82 (emphasis added). In response to counsel, the Court directed the defense "not to introduce any evidence of alibi without raising it with me before you raise it with the jury." N.T. 11/28/16 at 83. Still, counsel inexcusably failed to tell the Court or prosecution about defendant's alibi witnesses for the Reedland Street robbery until two weeks after he learned of the evidence, and moments before he called his first witness, thereby "jackpotting" an alibi in the middle of the trial, just as he had agreed not to do. Had counsel not thought that his evidence was an "alibi" that fell within the ruling of the Court, it is difficult to discern why he disclosed it at all prior to calling his witnesses.

Finally, notwithstanding all of the above, defendant was given full rein to present all of his alibi evidence. Under the circumstances, permitting the Commonwealth to state, and argue, that it did not have notice of the Reedland Street alibi witnesses was entirely fair and could not have prejudiced defendant. *See Servich,* 602 A.2d at 1343. No relief is due.

36

*L. Manufacturing Rules of Evidence*

Defendant next claims that the Court erred "by allowing the prosecutor to impermissibly manufacture rules of evidence and imply untrue facts during his cross examination of [the] defense private investigator, thereby prejudicing the jury against the defense and defense's investigation into the case. *See, inter alia*, N.T. 12/19/2016, 259-286." Statement of Errors at ¶ 12. This claim is without merit.

Defendant cites to the Commonwealth's entire cross-examination of Kevin Murphy, who testified on behalf of defendant Muhammed as a private investigator, and who testified that he had contacted witnesses in order to obtain information concerning defendant's facial hair at the time of the homicides in this case. N.T. 12/19/16 at 253, 259-286. Murphy testified that the witness he contacted, Debra Williams, stated that defendant could not be responsible for the Reedland Street robbery as defendant was present near her house at the time. N.T. 12/19/16 at 254-255. Murphy also testified that he did not memorialize Williams' statement or have Williams sign and adopt her statements. N.T. 12/19/16 at 266-267.

During Murphy's testimony, the Commonwealth asked Murphy if he knew that the "only way you could get [a written statement of a witness] in court if the person lies is if you took it in writing and they signed it and adopted it." N.T. 12/19/16 at 268. The Commonwealth was presumably referring to Pa.R.E. 803.1(1)(b), which sets forth the exception to the hearsay rule for a prior inconsistent statement that was signed and adopted by the declarant. Defendant objected to this question, and the Court sustained the objection since the statement could have been used for purposes other than the truth of the matter asserted, such as to refresh recollection or for impeachment. N.T. 12/19/16 at 268. This is the only instance in Murphy's cross-examination where defense counsel made an objection that appeared to relate to the rules of

37

evidence. Because the Court sustained defendant's objection, his claim of error is without merit. To the extent that he meant to challenge some other rulings of the Court, his claim is waived since defendant elected to cite the entire cross-examination of Murphy without directing the Court to any particular errors. *Cannon*, 954 A.2d at 1228.

### M. Demonstration of Defendant's Gait in Court

Defendant also asserts that the Court "erred in denying the defense's request to permit the defendant to demonstrate his gait in court. N.T. 12/19-2016, 288." Statement of Errors at ¶ 13. This claim is without merit.

The law concerning the admission of evidence in Pennsylvania is well settled:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002) (internal citations omitted); *see* Pa.R.E. 401-403.

Here, defendant sought to demonstrate his walking gait to the jury, as the jury had previously seen surveillance video of an individual, allegedly defendant, walking during a robbery. N.T. 12/19/16 at 288-289. However, over four years had passed since the robbery in question and defendant had both gained and lost over one hundred pounds of weight in that time. The gait of defendant four years later would not have any relevance to defendant's possible identity as the individual in the video and would not have provided probative evidence in defendant's case. Accordingly, the Court did not err in denying defendant's request.

*N. Commonwealth Misconduct in Closing Arguments*

Next, defendant asserts that the Court erred by "permitting the prosecutor to make arguments about evidence that was not in the record, make outrageous arguments which were designed to prejudice the jury against defense counsel and the defendants, and misrepresent the contents of the record. *See generally* N.T. 12/21/2016." Statement of Errors at ¶ 14. However, defendant cites to the entirety of the 12/21/16 notes of testimony, which include the prosecution's entire closing argument. Accordingly, this claim is waived, as the Court is left to guess as to what statements or arguments defendant is basing his claims upon. *See Cannon*, 954 A.2d at 1228.

Defendant also asserts that the Court erred by "permitting the prosecutor to commit misconduct by consistently making impermissible appeals to emotion and racial bias throughout the trial. *See, inter alia*, N.T. 12/21/2016, 33-34." Statement of Errors at ¶ 14. This claim, including citations to the record, is identical to the claim addressed in Section II.E.(2), above, and therefore is not addressed further here. No relief is due for the reasons there stated.

*O. Motion for Mistrial*

Finally, defendant asserts that the Court "erred in denying the defense's motion for a mistrial, as the prosecutor misrepresented the record and consistently made impermissible inflammatory appeals to emotion and racial bias throughout the trial, including but not limited to closing argument. *See, inter alia*, N.T. 12/21/2016, 64, 78." Statement of Errors at ¶ 15.

Defendant cites to two motions for mistrial that were made during the prosecutor's closing argument. The first was made after the prosecutor argued that the defense failed to present a Mr. Cooper as a witness, who ostensibly could have helped the defense by identifying

39

one of the robbers in a video as being a Mr. Tucker, and not one of the defendants. N.T. 12/21/16 at 64. In the challenged sentence, the prosecutor said the following:

> **[Prosecutor]:** Play the video that we've seen a thousand times, I feel. And Tucker would say – I mean, Mr. Cooper would say, "Nope" --
> **[Defense counsel]:** Objection.

N.T. 12/21/16 at 64. The defense argued that the prosecutor was stating that Cooper would not have been able to identify Tucker in the video, which was not part of the evidence. However, the prosecutor, who was interrupted mid-sentence in the text cited above, made it clear that he was merely arguing that Cooper had not been called as a witness, and we therefore do not know what he would have said:

> So the best person who could identify Mr. Tucker would be his employer, Mr. Cooper. Never shown the video. So either Cooper was going to say that's Tucker or it's not Tucker. He wasn't called.

N.T. 12/21/16 at 65. Accordingly, the prosecutor's argument regarding the defense's failure to call Cooper did not misstate the record and was not grounds for a mistrial.

Defendant's second cited motion for a mistrial occurred after the Commonwealth made reference to the fact that defendant had identified co-defendant Scott as his coconspirator in his statement to the police, leading the prosecutor to argue that the best witness against Scott was defendant. N.T. 12/21/16 at 78. Because this mistrial motion was made only by co-defendant Scott, it cannot be grounds for relief for defendant. N.T. 12/21/16 at 78-79. Accordingly, no relief is due.

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

40

Commonwealth v. Ibrahim Muhammed
Type of Order: 1925(a) Opinion

CP-51-CR-0004101-2012
CP-51-CR-0004103-2012
CP-51-CR-0004105-2012

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

Lawrence S. Krasner, Esq.
239 S. Camac St.
Philadelphia, PA 19107

Type of Service:     ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**District Attorney(s):**

Hugh J. Burns, Jr., Esquire
Chief, Appeals Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Type of Service     ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**Additional Counsel/Party:**

Joseph D. Seletyn, Esquire
Prothonotary
Office of the Prothonotary – Superior Court
530 Walnut Street, Suite 315
Philadelphia, PA 19106

Type of Service:     ( ) Personal  (**X**) First Class Mail  ( ) Other, please specify:

**Dated:  June 12, 2017**

Grace Tirotti
Judicial Secretary to Hon. Glenn B. Bronson